# CHARLESTON

## MORGAN v. BARTLETT.

Submitted November 18, 1914.   Decided December 15, 1914

1. SPECIFIC PERFORMANCE—*Sale of Corporate Stock—When Allowed.*

    Specific performance of a contract for the sale of stock in a corporation may be had at the suit of the seller, if it is made to appear that such stock is not for sale in the general market and is of uncertain value. In such case an action at law for damages is inadequate.   (p. 294).

2. SAME—*Sale of Corporate Stock—Uncertain Value—Evidence.*

    Proof that stock in the same corporation was sold by the individual holders thereof about the time the sale in question was to have been consummated, at widely variant prices, is evidence of its uncertain value.   (p. 296).

    (LYNCH, JUDGE, absent.)

Appeal from Circuit Court, Harrison County.

Bill by Haze Morgan against Meigs J. Bartlett. Decree for defendant, and complainant appeals.

*Reversed and decree entered here.*

*W. M. Conaway* and *J. O. Tidler,* for appellant.

*Carter & Sheets* and *B. B. Jarvis,* for appellee.

WILLIAMS, JUDGE:

Plaintiff filed his bill praying to have specific performance of an alleged contract of sale to defendant of 3,400 shares of stock in the Mary Mining Company, a corporation, tendering therewith the certificates of stock duly assigned to defendant. He avers that he tendered the certificates, so assigned, on the day the sale was to be consummated by delivery of the stock and payment of the money therefor. He exhibits the contract of sale, which he avers was written by defendant himself, which is as follows: "Aug. 29, 1910. I agree to take 3400 shares of Haze Morgan (Mary Mining Stock) at 35c. per share on or before Sept. 15, 1910. (Signed) M. J. Bartlett." "I Haze Morgan bind myself to deliver to M. J. Bartlett the above No. of shares of Mary Mining Stock at 35c. per share

on the above date. (Signed) Haze Morgan.'' He also avers that said corporation is of recent creation and is reputed to have large copper and gold mineral holdings in the Republic of Mexico which it is just beginning to develop, but that it has not yet paid any dividends; that it has issued and sold all the stock it now proposes to sell and no more stock is now for sale by it; that its stock is not procurable in the open market for any known price and its value is not readily ascertainable; that the stock has no provable value and is sold by the holders thereof at different prices; that the enterprise of the corporation, from a financial standpoint, is uncertain; and, therefore, he can not be compensated in damages for defendant's breach of contract.

Defendant answered denying that he had contracted to buy the stock, but admitting that on the 29th day of August, 1910, he and plaintiff had a conversation in regard to the purchase of the stock, and that the price talked of was 35c. per share. He also admits that, on that day, a memorandum in writing was made of their agreement which, he alleges, was an option and not a sale. That memorandum he exhibits with his answer, and avers that it was made at a later hour in the day than the writing claimed by plaintiff to be their contract; that neither of them was bound by the agreement, but that it was only an option on the part of both, and that either party had a right to refuse to consummate it. The memorandum reads as follows: ''Memo. 8/29/10. Dr. Bartlett agrees to buy Morgan's Mary Mining Company Stock —3400 shares for $1190— on or before 9/15/10, if Morgan will sell at that price when Bartlett gets ready to buy.

''Morgan agrees to sell at that price unles offered a better price. (Signed) H. M.''

Plaintiff replied generally, and depositions were taken by both plaintiff and defendant, and on the 22nd of January, 1913, the cause was finally heard and the decree denying relief and dismissing plaintiff's bill was made.

Apparently the court dismissed the bill for want of jurisdiction in equity. In this we think the court erred. That equity has jurisdiction to grant relief by decreeing specific performance of a contract for the sale of stock in a corpora-

tion, when the stock has a special or peculiar value and is not readily purchasable in the market, or when it has no certain ascertainable value, there can be little doubt. That such is the law of this state was held in *Hogg* v. *McGuffin,* 67 W. Va. 456, and *Bumgardner* v. *Leavitt,* 35 W. Va. 194. The former was a suit by the purchaser of stock in a coal company, and the latter was a suit by the seller of stock in a steamboat company, and the court entertained jurisdiction and granted relief in both cases. McGuffin had organized a corporation for the purpose of mining coal in Mingo county, and induced Hogg to purchase fifty shares of the capital stock at the par value of $100 per share, agreeing with him, at the time of his purchase, that if he should wish to dispose of it within two years thereafter, he (McGuffin) would give him in exchange therefor fifty shares of stock in the Harvey Coal Company. Hogg elected to make the exchange within the time, and so notified McGuffin. But in the meantime McGuffin had sold his Harvey Coal Company stock to a third person and, therefore, could not comply with his contract. The court held, however, that, by virtue of his contract, Hogg had a right to the funds derived from the sale of the Harvey stock. This was as near to a specific performance of the contract as the court could approach in that case on account of the intervening rights of innocent third parties. The first point of the syllabus in that case is as follows: ''Equity will decree specific performance of a contract for exchange of shares of stock in corporations when legal remedy is not adequate because the stock sought is of special and peculiar value, or is not readily purchasable in the market, or has no ascertainable value, or a money judgment against the party would be worthless because of his insolvency, or other circumstance in the case calling for specific performance as the only adequate relief.''

In the *Bumgardner* v. *Leavitt* case, Mrs. Bumgardner had purchased stock from Leavitt in a steamboat which he was building, under a contingent agreement that he would repurchase the stock, at cost, or if the boat depreciated in value, then at a fair cash value. The contingencies happened, and she gave him notice of her election to resell him the stock,

and requested him to comply with his agreement. He declined and she sued for specific relief and obtained it. The same rule was again announced in *Lathrop* v. *Collieries Co.* 70 W. Va. 58. The following authorities are also in point: *Safford* v. *Barber*, 74 N. J. Eq. 352, 70 Atl. 371; *Northern Cent. Ry. Co.* v. *Walworth*, 193 Pa. St. 207, 74 Am. St. Rep. 683; *Manton* v. *Ray*, 18 R. I. 672, 49 Am. St. Rep. 811; *Palmer* v. *Graham*, 1 Parson's Eq. Cases, (Pa.), 476; 36 Cyc. 560; and 26 A. & E. E. L. (2nd ed.) 122.

The general rule is, that for a breach of contract for the sale of personal property the parties are left to their remedy at law. But there are many exceptions to the rule. Where, because of the peculiar and exceptional value of the property, as in the case of slaves, *Summers* v. *Bean*, 13 Grat. 404, or in case of heirlooms, 26 A. & E. E. L. 104, or the inability to duplicate the property in the market, and the uncertainty of its value, and, therefore, uncertainty in the matter of ascertaining the amount of damages. In such cases equity will generaly compel performance. *St. Regis Paper Co.* v. *Santa Clara Lumber Co.*, 173 N. Y. 149, 65 N. E. 967. Stock in a corporation, not procurable in the market and having an uncertain value, comes within the exception to the general rule respecting specific performance. Inadequacy of legal remedy is the basis for equity jurisdiction to enforce performance.

The general rule also is that the remedy is a mutual one. *Bumgardner* v. *Leavitt, supra,* and 26 A. & E. E. L. 28. To this general rule there may also be exceptions, as for instance, where one party is bound by a writing signed by him and the other has not signed it and is not so bound because of the statute of frauds. But it is not necessary to inquire into the exceptions to the rule, because the present case falls within the general rule respecting mutuality of remedy. If one party has the right to enforce the contract the other has also.

A number of persons in and around Clarksburg, where the parties to this suit resided, owned stock in the Mary Mining Company, and it is contended that plaintiff could easily have proven the value of his stock and, consequently, the amount

of his damage, if any he suffered. But it is shown, by the depositions of witnesses, that about the time the alleged agreement was made, and before and after that time, the stock had sold at different prices, ranging all the way from 15c to 65c. per share, according to the degree of faith that the sellers and purchasers, respectively, happened to have in the success of the corporation's enterprise. Defendant was the owner of 19,000 shares at the time he made the alleged agreement with plaintiff, and he says he was offered, shortly thereafter, 2000 shares at 25c. per share, by Mr. A. J. Simmons of Clarksburg, who was the owner thereof.

This evidence proves that the stock had no certain market value. It had no rating in the stock market, and every man who had stock and wanted to sell it, sold at such price as he was able to get. It also appears that about this time many of the stockholders, in and about Clarksburg, had lost faith in the ultimate success of the corporation's enterprise, and wanted to sell their stock. Under such conditions and circumstances it would have been impracticable for plaintiff to prove the amount of his damages; and, therefore, his remedy at law was not adequate. Consequently, if he has proved his contract he is entitled to have it enforced.

The next question is: Has the contract of sale been proven? We think it has. Defendant admits, in his deposition, that he signed the agreement exhibited with the bill, but insists that the option which he filed with his answer, signed "H. M.", was later, on the same day, left on his desk, and that it annulled the agreement signed earlier in the day by both parties. He does not say he was present when the option was written, or that it was handed to him by Morgan. He says: "My recollection does not serve me correctly as to the exact time I found it, but I found this on my desk after we had made this other contract." We are forced to the conclusion, from this and other evidence, that defendant must be mistaken as to the time this option was written out and signed with the initials of plaintiff and left on his desk. It must have been before, and not after, the contract exhibited with the bill was written and signed by both parties. Plaintiff and defendant occupied adjoining office rooms which communicated with each other,

and they met frequently, sometimes more than once on the same day. Plaintiff swears that they had two transactions on the 29th of August, one before noon and one afternoon; that in the former they had a conversation, and agreed orally to what is stated in the option signed "H. M."; that after their talk he wrote out the option, retaining a carbon copy, and placed it in an envelope addressed to Dr. Bartlett, and then returned to deliver it to him and did not find him in his office and left it on his desk; that at that time he (plaintiff) did not wish to enter into a binding contract to sell at 35c. a share, because he hoped to get a better price, and says that, a week before that, he had been offered 50c. a share by E. F. Goodwin, an officer in the Mary Mining Company, who lived in Clarksburg; that, after talking with defendant, he again went to Goodwin and asked him what he ought to get for his stock, and found that Goodwin or his clients were not so anxious then to buy, and he again went to defendant's office in the afternoon and told him, if he would enter into a positive agreement of sale, he would sell him the stock at 35c. per share, and that thereupon the contract sought to be enforced was written out by defendant, and was then signed by both of them. Defendant does not deny that the paper was then turned over to plaintiff, or that he wrote it. Is it not highly improbable that experienced business men, (and they both appear to be such), should make a written contract, mutually binding, and then later attempt to convert it into an option not binding on either of them, without cancelling the original agreement? It was not only wholly unbusinesslike, but the so-called option was valueless and useless. It is not even a unilateral contract, it obligated neither party to do anything. It makes no reference to the original contract, and, therefore, does not seem to have been intended as a cancellation of it. The only rational explanation to be found for the existence of the two papers, the execution of both of which is admitted by the parties, is that the so-called option was made first and the sale contract later.

This conclusion leads to a reversal of the decree. A decree will be entered here requiring defendant to pay to plaintiff the sum of eleven hundred and ninety ($1,190.00) dollars,

with interest thereon from the 15th day of September, 1910, and that he be then entitled to the 3400 shares of stock, and that he pay plaintiff his costs both in this court and in the court below.

*Reversed and decree entered here.*